NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 24-5231

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

CALIFORNIA VALLEY MIWOK TRIBE, et al.,
*Plaintiffs/Appellants*,

v.

DOUGLAS BURGUM, et al.,
*Defendants/Appellees*.

---

Appeal from the United States District Court for the District of Columbia
No. 1:22-cv-01740 (Hon. Jia M. Cobb)

---

**BRIEF FOR APPELLEES**

---

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*

AMBER BLAHA
MARY GABRIELLE SPRAGUE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-2753
mary.gay.sprague@usdoj.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties and Amici

The Federal Defendants/Appellees in this case are Douglas Burgum, in his official capacity as the Secretary of the U.S. Department of the Interior; Scott Davis, in his official capacity exercising the authority of the Assistant Secretary-Indian Affairs; Ryan Hunter, in his official capacity as Acting Regional Director, Pacific Regional Office, Bureau of Indian Affairs; and Jason Vanderheide, in his official capacity as Acting Superintendent, Central California Agency, Bureau of Indian Affairs.  The Plaintiffs/Appellants in this case are Marie Diane Aranda, Joshua Fontanilla, Yolanda Fontanilla, Bronson Mendibles, Jasmine Mendibles, Leon Mendibles, Michael Mendibles, Christopher Russell, and Rosalie Russell, and Plaintiffs/Appellants purporting to represent the California Valley Miwok Tribe.  Chadd Everone filed a motion for leave to file an amicus curiae brief in the district court, which the district court denied.

### B.     Rulings Under Review

The ruling under review is the order and opinion in California Valley Miwok Tribe v. Haaland, No. 1:22-cv-01740-JMC, Docket Nos. 45 & 46 (Aug. 12, 2024), United States District Judge Jia M. Cobb, presiding.  The opinion is unreported.

i

## C. Related Cases

The case on review was not previously before this court or any other appellate court. Appellees are aware of the following pending related cases: California Valley Miwok Tribe v. Haaland, No. 24-cv-00947-JMC (D.D.C.); and Burley v. Haaland, No. 24-cv-02455-JMC (D.D.C.).

/s/ *Mary Gabrielle Sprague*
MARY GABRIELLE SPRAGUE

Counsel for Appellees

ii

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
      CASES ................................................................................................i

TABLE OF AUTHORITIES ...........................................................................v

GLOSSARY ........................................................................................ viii

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION................................................................3

STATEMENT OF THE ISSUES....................................................................3

PERTINENT STATUTES AND REGULATIONS...................................................4

STATEMENT OF THE CASE.........................................................................4

      A.     Factual background .............................................................4

      B.     Legal Background ..............................................................10

            1.     The Indian Reorganization Act and implementing
                   regulations.....................................................................10

            2.     Prior cases addressing the Tribe's organization ......................11

                  a.     Silvia Burley's challenge to Interior's 2004
                       rejection of a proposed tribal constitution for
                       a five-member tribe.........................................12

                  b.     The Yakima Dixie faction's challenge to the
                       2011 Echo Hawk Decision .............................13

                  c.     The Burley faction's challenge to the 2015
                       Washburn Decision.........................................14

      C.     The Newland Decision .......................................................16

      D.     District Court Proceedings ..................................................19

SUMMARY OF ARGUMENT ...................................................................22

STANDARD OF REVIEW ......................................................................25

ARGUMENT ..........................................................................................26

I.      The Newland Decision reasonably revised the Washburn
        Decision in response to new genealogical evidence. ...................26

        A.      Newland reasonably revisited the Washburn Decision in
                light of the new conclusion that John Jeff was not Jeff
                Davis's son. ....................................................................28

        B.      Newland reasonably corrected the genealogical error by
                adding 1929 Census descendants as a group eligible to
                participate in the Tribe's organization. .................................30

        C.      *CVMT III* does not mandate that 1915 Census
                descendants are "putative members" with the exclusive
                right to determine tribal membership criteria for all other
                potential members. ..........................................................34

        D.      Plaintiffs' arguments about Silvia Burley are not properly
                presented in this case.......................................................44

        E.      Plaintiffs' personal criticisms of AS-IA Newland are
                inappropriate....................................................................47

II.     Newland did not unreasonably delay the revision of the
        Washburn Decision...............................................................48

III.    Plaintiffs' argument that the doctrine of issue preclusion barred
        Newland from revising the Washburn Decision lacks merit........53

CONCLUSION.....................................................................................55

CERTIFICATE OF COMPLIANCE.......................................................56

iv

# TABLE OF AUTHORITIES*

**Cases**

*Aguayo v. Jewell*,
827 F.3d 1213 (9th Cir. 2016) ........................................................................16

*Al-Tamimi v. Adelson*,
916 F.3d 1 (D.C. Cir. 2019) ....................................................................... 49, 52

*Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*,
461 U.S. 402 (1983) .................................................................................. 25, 43

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
462 U.S. 87 (1983) .................................................................................... 22, 26

*California Valley Miwok Tribe v. Haaland*,
No. 24-cv-947, 2024 WL 4345787 (D.D.C. Sept. 30, 2024) .............................33

*California Valley Miwok Tribe v. United States*,
424 F. Supp. 2d 197 (D.D.C. 2006) ("*CVMT I*")......................................... 12, 30

*California Valley Miwok Tribe v. United States*,
515 F.3d 1262 (D.C. Cir. 2008) ("*CVMT II*") .................... 2, 9, 12, 15, 22, 23, 27

*California Valley Miwok Tribe v. Jewell*,
5 F. Supp. 3d 86 (D.D.C. 2013)
("*CVMT III*").............................. 13, 15, 23, 24, 31, 32, 34, 36, 38, 39, 40, 43, 55

*California Valley Miwok Tribe v. Zinke,* No. 16-cv-1345, 2017 WL 2379945
(E.D. Cal. June 1, 2017) ("*CVMT IV*")........................................................ 15, 16

*California Valley Miwok Tribe v. Zinke*, 745 F. App'x 46, 47
(9th Cir. 2018) ("*CVMT V*") ............................................................. 7, 16, 18, 19

*City of Roseville v. Norton*,
348 F.3d 1020 (D.C. Cir. 2003).....................................................................5, 6

---

* Authorities upon which we chiefly rely are marked with asterisks.

v

*Cnty. of Amador v. Dep't of the Interior*,
  872 F.3d 1012 (9th Cir. 2017) ................................................................4, 5

*Cnty. of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*,
  502 U.S. 251 (1992) ................................................................................10

*Deerfield v. F.C.C.*,
  992 F.2d 420 (2d Cir. 1993) ....................................................................54

*Defenders of Wildlife v. Zinke*,
  849 F.3d 1077 (D.C. Cir. 2017) ..............................................................25

*F.C.C. v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ................................................................... 25, 26, 27

*Flynn v. Comm'r of Internal Revenue*,
  269 F.3d 1064 (D.C. Cir. 2001) ..................................................... 36, 49

*Gov't of Manitoba v. Bernhardt*,
  923 F.3d 173 (D.C. Cir. 2019) ................................................................29

*Ivy Sports Med., LLC v. Burwell*,
  767 F.3d 81 (D.C. Cir. 2014) ......................................................... 26, 53

*Jones v. Air Line Pilots Association, Int'l*,
  642 F.3d 1100 (D.C. Cir. 2011) ..............................................................53

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024) ........................................................................ 33, 34

*Morris v. Watt*,
  640 F.2d 404 (D.C. Cir. 1981) ................................................................22

*Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*,
  463 U.S. 29 (1983) .............................................................. 32, 49, 51, 52

*Nat. Res. Def. Council v. Regan*,
  67 F.4th 397 (D.C. Cir. 2023) ................................................................26

*Spawr Optical Research, Inc. v. Baldrige,*
  649 F. Supp. 1366 (D.D.C. 1986) ...............................................................54

## Statutes

5 U.S.C. § 706(1) ................................................. 1,20, 24, 48, 49, 51
5 U.S.C. § 706(2)(A)................................................. 3, 20, 25, 26
25 U.S.C. § 2 ...........................................................................26
25 U.S.C. § 5101 ........................................................................1
25 U.S.C. § 5123(a)(1)............................................................ 10, 37
25 U.S.C. § 5129 ..................................................................... 6, 11
28 U.S.C. § 1291 .........................................................................3
28 U.S.C. § 1331 .........................................................................3
28 U.S.C. § 2401(a) ............................................................... 24, 49

## Regulations

25 C.F.R. Part 2.................................................................... 25, 51
25 C.F.R. Part 81.................................................................... 11, 37

## Other Authorities

Pub. L. No. 73-383, 48 Stat. 984 (1934),.................................................10
Pub. L. No. 85-671, 72 Stat. 619 (1958)...................................................8
Pub. L. No. 88-419, 78 Stat. 390 (1964)...................................................8

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| AS-IA | Assistant Secretary-Indian Affairs |
| BIA | Bureau of Indian Affairs |
| CVMT | California Valley Miwok Tribe |
| *CVMT I* | 424 F. Supp. 2d 197 (D.D.C. 2006) |
| *CVMT II* | 515 F.3d 1262 (D.C. Cir. 2008) |
| *CVMT III* | 5 F. Supp. 3d 86 (D.D.C. 2013) |
| *CVMT IV* | No. 16-cv-1345, 2017 WL 2379945 (E.D. Cal. June 1, 2017) |
| *CVMT V* | 745 F. App'x 46 (9th Cir. 2018) |
| IRA | Indian Reorganization Act |

## INTRODUCTION

The California Valley Miwok Tribe ("Tribe" or "CVMT") is a federally recognized Indian tribe in northern California that has suffered long-running membership and leadership disputes.  These disputes delayed the initial organization of the Tribe under the Indian Reorganization Act ("IRA"), 25 U.S.C. § 5101 et seq.  Plaintiffs/Appellants are nine individuals who claim to be the group of tribal members eligible to participate in the initial organization of the Tribe as descendants of those on the 1915 Census of "Sheepranch Indians."[2]  Defendants/ Appellees are four officials of the Department of the Interior (collectively referred to herein as "Interior").

Plaintiffs filed suit in district court under the Administrative Procedure Act ("APA") challenging a May 31, 2022 decision by Bryan Newland, then Assistant Secretary-Indian Affairs ("AS-IA"), stating the eligibility criteria for individuals to participate in the Tribe's initial organization ("Newland Decision").  The 2022 Newland Decision revised a December 30, 2015 decision by AS-IA Kevin Washburn ("Washburn Decision) based on newly discovered genealogical evidence.  The district court rejected their challenge.

---

[2] The individual Plaintiffs name the California Valley Miwok Tribe as the lead Plaintiff, but the question to be decided in this case is whether they represent the Tribe.

1

In this appeal, Plaintiffs—calling themselves the "putative members"—argue that they are the only Miwok Indians with sufficient historical connection to the Sheep Ranch Rancheria in Calaveras County, California, to draft a proposed tribal constitution that will define the Tribe's membership. This Court rejected a similar "antimajoritarian gambit" by a different small group of Miwok Indians in an earlier attempt to organize the Tribe. *California Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1267 (D.C. Cir. 2008) ("*CVMT II*"). Plaintiffs misplace reliance on *California Valley Miwok Tribe v. Jewell*, 5 F. Supp. 3d 86 (D.D.C. 2013) ("*CVMT III*"), which, like this Court in *CVMT II*, recognized that the record was "replete with evidence" that the Tribe consisted of an extended community of at least 250 individuals, *id*. at 98. Contrary to Plaintiffs' argument, *CVMT III* does not mandate that this small group of 1915 Census descendants has the exclusive right to decide whether the larger group of descendants of Miwoks on the 1929 Indian Census of Calaveras County are eligible for tribal membership.

AS-IA Newland reasonably found, based on careful analysis of an extensive administrative record, that AS-IA Washburn had intended that the extended tribal community would be eligible to participate in the Tribe's initial organization, but that Washburn's Eligible Groups (identifying 13 tribal ancestors) turned out to deprive most of that community of their right to participate because of an error in BIA's genealogical record discovered in 2019. Newland then reasonably revised

Washburn's eligibility criteria to effectuate his intent and ensure that the appropriate tribal community could participate in the organization of the Tribe. This Court should affirm the district court's judgment denying Plaintiffs' motion for summary judgment and granting Interior's cross-motion for summary judgment.

## STATEMENT OF JURISDICTION

(A)     The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arose under the APA, 5 U.S.C. §§ 706(1) and (2), seeking to compel Interior to proceed with organizing the Tribe under the 2015 Washburn decision and to set aside the 2022 Newland Decision.

(B)     The district court denied Plaintiffs' motion for summary judgment and granted Interior's cross-motion for summary judgment on August 12, 2024, and entered judgment that same day. Plaintiffs filed a timely notice of appeal on October 7, 2024.

(C)     This Court has jurisdiction under 28 U.S.C. § 1291 because the appeal is from a final judgment that disposes of all parties' claims.

## STATEMENT OF THE ISSUES

1.     Whether Newland's revision of the Washburn Decision was arbitrary and capricious under 5 U.S.C. § 706(2)(A).

3

2.      Whether Newland unreasonably delayed revising the Washburn

Decision under 5 U.S.C. § 706(1).

3.      Whether the doctrine of issue preclusion precluded Newland from

revising the Washburn Decision.[3]

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the Addendum

following this brief.

## STATEMENT OF THE CASE

### A.      Factual background

In 1905, the Secretary of the Interior, at Congress's direction, tasked Indian

Agent C.E. Kelsey with investigating the condition of the landless Indians in

California. *See Cnty. of Amador v. Dep't of the Interior*, 872 F.3d 1012, 1015-16

(9th Cir. 2017). Kelsey's 1906 report included a survey reporting thousands of

landless Indians, including 94 in Calaveras County. JA_____ [ECF 34-1 at 4-5,

62-63].[4]  In response, Congress appropriated money to support them and to

---

[3] This statement of the issues is based on the three parts of Plaintiffs' "Argument" in its Opening Brief filed April 15, 2025. *See* Opening Br. 39-54. Plaintiffs' five "Issues Presented," *id*. at 5-7, all appear to relate to Argument Part I.

[4] Consistent with the district court's opinion, pincites to documents filed in the district court are to the automatically generated ECF Page ID number. Most Administrative Record documents cited in this Brief were included in the Summary Judgment Appendix, ECF 34, and are cited by ECF number. Administrative Record documents that were not included in that Appendix are

4

purchase land for those "who are not now upon reservations." Act of June 21, 1906, 34 Stat. 325, 333. And it continued to appropriate additional money for that purpose in the following decades. *See Cnty. of Amador*, 872 F.3d at 1016.

In 1915, Indian Agent John Terrell identified twelve Indians "at and near Sheepranch in Calaveras Co." ("1915 Census"). JA___ [ECF 34-3 at 4]. There were three families on the 1915 Census: (1) Peter and Annie Hodge and their four children; (2) Jeff and Betsey Davis, his mother, and their granddaughter; and (3) John and Pinkey Tecumchey.[5] Terrell reported three Indian cabins at Sheep Ranch and the residence of the Hodge family "about 3½ miles north of Sheepranch." JA___ [*id*. at 2]. He described these Indians as "the remnant of once quite a large band of Indians in former years living in and near the old decaying mining town" and stated that they were "[t]o some extent … interchangeable in their relations" with the Indians of "Murphys, Six-Mile, Avery and Angles [presumably Angels Camp]."[6] JA___ [*id*. at 2, 4].

---

cited by "CVMT" numbers. *See* JA___ [ECF 25] (index to Administrative Record).

[5] Plaintiffs trace their ancestry to Peter Hodge's daughter, Lena Hodge Shelton. JA___ [ECF 28-8].

[6] This Court described the similar plight of the "surviving families of the Maidu and Meiwok Tribes" near Sacramento that had been "devastated by the settlement policies of the nineteenth century" and "the depredation that came with the settlement of California." *City of Roseville v. Norton*, 348 F.3d 1020, 1022 (D.C. Cir. 2003).

In 1916, Interior purchased an approximately one-acre parcel that became Sheep Ranch Rancheria.  JA___ [ECF 34-15 at 3] (1966 BIA letter stating that the 1916 deed "is in the name of the United States of America and does not name any specific tribe, band or group of Indians").  In 1927, Interior determined that 125 Indians lived in Calaveras County, with 25 Indians in the vicinity of Sheep Ranch and "13 or 14 Indians residing on" the Rancheria. JA___ [ECF 34-4 at 5] (1927 letter from Sacramento Indian Agency Superintendent L. Dorrington).

In 1929, Superintendent Dorrington listed the Indians in Calaveras County ("1929 Census").  JA___ [ECF 34-5].  The 1929 Census identified 134 persons as exclusively "Mewuk" (and a smaller number of Indians as Mewuk-Tuolomne, Tuolomne-Mewuk, Tuolumne, or Laolumne).[7]  *Id*.  The families listed on the 1915 Census were also listed on the 1929 Census along with many other families. Miwok Indians on the 1929 Census included the families of Jeff Davis, Joe Dixie, Mabel Hodge, John and Tillie Jeff, and Lena Shelton (formerly Hodge).  The 1929 Census did not identify any specific residences.

In 1935, Jeff Davis was the sole resident of the Rancheria, and, as such, the sole person to vote on behalf of the Rancheria to accept the IRA.  JA___ [ECF 34-7] (1935 election summary); 25 U.S.C. § 5129 (defining "tribe" to include "Indians

---

[7] There are various spellings of Miwok in the record.  This brief uses "Miwok" unless directly quoting a different spelling.

residing on one reservation"). He passed away in 1940, and the record contains no indication that a 1915 Census descendant resided on the Rancheria thereafter. JA___ [ECF 34-62 at 51] (Beckham Report) (land subsequently occupied by "several Indians not identified in the [1915] census").

The BIA consistently recognized the rights of Miwoks listed on the 1929 Census and their descendants. By 1943, Tillie Jeff, widow of John Jeff, resided on the Rancheria. JA___ [*id*. at 48]. BIA recognized that Tillie Jeff "is a resident of the Sheep Ranch Rancheria" and that she had "a right to reside thereon as long as she desire[d]." JA___ [*id*. at 49]. Several of John and Tillie Jeff's descendants also lived on the Rancheria beginning in the 1940s. JA___ [*id.* at 51]. By about 1943, "Lena (Hodge) Shelton … resided on a lot *adjacent to* the rancheria." *Id.* (emphasis added). It thus appears that the Jeff family and its descendants and Plaintiffs' ancestor Lena Hodge Shelton were part of a Miwok community centered around the Rancheria.

In 1954, Tom Hodges (listed on both the 1915 Census and 1929 Census) asked BIA about "ownership or rights to the Sheep Ranch Rancheria." *See* JA___ [ECF 34-8] (1954 letter from BIA Area Director). BIA rejected Hodges' request to live on the Rancheria in favor of Dan Carsoner (listed on the 1929 Census), stating that Mr. Carsoner, his wife, and six children had a "right of residence" and had resided on the Rancheria since 1950. *Id*. But Mr. Hodges "ha[d] no rights in

7

the Sheep Ranch Rancheria" because he had been "elected to membership" in the Tuolumne Tribe and had a home on the Tuolumne Reservation. *Id*. BIA's response illustrated both the fluidity of the Calaveras County Indians noted by Agent Terrell in 1915 and BIA's view that being listed on the 1915 Census did not afford exclusive property rights.

In the 1950s, Antone Azevedo and Velma Whitebear, descendants of John and Tillie Jeff, lived with their families on the Rancheria. JA___ [ECF 34-23 at 2] (2011 Azevedo affidavit); JA___ [ECF 34-29 at 3] (2011 Whitebear affidavit); *see also* JA___ [ECF 34-42 at 5] (2014 letter from Chadd Everone).

In the late 1950s and early 1960s, Congress directed that the land and assets of certain Rancherias be distributed as part of a since-reversed policy of terminating those Rancherias. Rancheria Act, Pub. L. No. 85-671, 72 Stat. 619 (1958), as amended by Pub. L. No. 88-419, 78 Stat. 390 (1964). In 1965, BIA found that Mabel Dixie, Merle Butler (her husband), and Lenny Jeff lived on the Sheep Ranch Rancheria. JA___ [ECF 34-13]. None of them descended from 1915 Census Indians. JA___ [ECF 34-62 at 39-40] (Beckham Report). All three were listed on the 1929 Census. JA___ [ECF 34-5 at 5] (listed as Mabel Hodge); JA___ [*id*. at 7]. Mabel was John Jeff's granddaughter.[8] JA___ [ECF 34-62 at 40-41]

---

[8] It was once believed that Mabel Dixie descended from an individual listed on the 1915 Census. Opening Br. 20 n.11; *CVMT III*, 5 F. Supp. 3d at 89. That proved

(Beckham Report). She lived on the Rancheria from approximately 1958 until at least 1967. JA___ [ECF 34-14 at 1] (1966 Tribal Operations Memorandum). Lenny Jeff was one of John and Tillie Jeff's sons. JA___ [ECF 34-5 at 7]. Thus, as of 1965, the Rancheria was occupied by members of the broader Miwok community documented on the 1929 Census rather than 1915 Census descendants.

During the 1966 distribution process, BIA again rejected claims to the Rancheria by individuals on the 1915 Census, including Plaintiffs' ancestor. BIA determined that "Lena Hodges Shelton and Tom Hodges [were] ineligible to participate in the election" regarding distribution. JA___ [ECF 34-15 at 4-5] (1966 letter from L. Hill). Interior instead transferred beneficial title to the entire Rancheria to Mabel Dixie. JA___ [ECF 34-16] (1967 Deed).

After Mabel Dixie passed away in 1971, BIA transferred the beneficial interest in the Rancheria to her heirs—her four sons and her husband, Merle Butler. JA___ [ECF 34-17] (1971 Order Determining Heirs); JA___ [ECF 34-43 at 4] (Washburn Decision). Thereafter, her son Yakima Dixie was the sole resident of the Rancheria. JA___ [ECF 34-43 at 4]. Yakima Dixie died in 2017. JA____ [ECF 34-45]. Yakima Dixie, the last surviving son, had willed his interest in the Rancheria to his cousin Velma Whitebear "to be used for my Tribe." JA____ [ECF 34-35 at 5-6] (will); JA___ [ECF 34-70] (probate). Beneficial title in the

_____

incorrect after additional research. *See* JA____ [ECF 34-62 at 40-41] (Beckham Report).

9

Rancheria is currently held by Whitebear's heirs (2/3 interest) and Dequita Boire (a descendant of Merle Butler) (1/3 interest). JA\_\_\_ [ECF 34-71] (2021 Title Status Report).

As explained below, many members of the Miwok community in Calaveras County are descendants of John Jeff, who was listed on the 1929 Census but not the 1915 Census. Genealogical information held by the BIA showed that John Jeff was the son of Jeff Davis, who was listed on the 1915 Census and voted for the IRA in 1935. JA\_\_\_ [ECF 34-18 at 4] (1995 letter regarding Burley genealogy). It was determined in 2019, however, based on additional genealogical research, that John Jeff was not the son of Jeff Davis and that Jeff Davis had no living descendants. JA\_\_\_ [ECF 34-64] (Office of Federal Acknowledgment memorandum).

## B.    Legal Background

### 1.    The Indian Reorganization Act and implementing regulations

Congress enacted the Indian Reorganization Act ("IRA"), Pub. L. No. 73-383, 48 Stat. 984 (1934), to support "principles of tribal self-determination and self-governance." *Cnty. of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 255 (1992). The IRA authorizes tribes to organize by ratifying constitutions through elections supervised by the Secretary of the Interior (called "Secretarial elections"). *See* 25 U.S.C. § 5123(a)(1) (previously codified at

10

25 U.S.C. § 476(a)(1)).  The IRA defines "tribe" as "any Indian tribe, organized band, pueblo, or other Indians residing on one reservation."  25 U.S.C. § 5129.

Interior has promulgated regulations governing Secretarial elections.  25 C.F.R. Part 81.  As relevant here, a group of people potentially eligible to be tribal members may draft a proposed constitution and petition for a Secretarial election.

Plaintiffs argue for a process by which a select group of "putative members," assertedly those with most knowledge of the tribal community, draft a proposed constitution that determines the criteria for tribal membership.  Neither the IRA nor the Part 81 regulations provide for such "putative members" or the process Plaintiffs describe.

### 2.    Prior cases addressing the Tribe's organization

Beginning in the late 1990s, the Tribe made multiple efforts to organize, which failed because of repeated membership and leadership disputes.  In a series of five decisions, this Court and other courts addressed Interior's authority to assist CVMT to organize under the IRA.  The district court well summarized these proceedings based on these decisions and the administrative record in this case.  JA___ [Op. 6-12].  These decisions repeatedly affirmed the need to involve the whole tribal community, not just a small tribal faction, in the Tribe's organization.

       **a.**        **Silvia Burley's challenge to Interior's 2004 rejection of a proposed tribal constitution for a five-member tribe.**

In 2004, Silvia Burley submitted to BIA a proposed tribal constitution defining the Tribe to include only five members: herself, her two daughters, her granddaughter, and Yakima Dixie. *See California Valley Miwok Tribe v. United States*, 424 F. Supp. 2d 197, 200 (D.D.C. 2006) ("*CVMT I*"). Interior declined to approve it because the process excluded many potential members of "the whole tribal community," including people who had lived on or adjacent to the Rancheria for decades and the larger group of "Indian communities in and around the Sheep Ranch Rancheria … who ha[d] maintained ... cultural contact with Sheep Ranch." JA____ [ECF 34-20 at 2-3] (Mar. 26, 2004 letter from BIA).

Ms. Burley, purporting to represent the Tribe, challenged Interior's refusal to approve the constitution. *CVMT I*, 424 F. Supp. 2d at 200-01. The district court rejected the challenge, explaining that BIA had a "duty to ensure that the interests of all tribe members are protected during organization and that governing documents reflect the will of a majority of the Tribe's members." *Id*. at 202.

This Court affirmed, stating that the Government's authority to manage Indian affairs "is especially vital when, as is the case here, the government is determining whether a tribe is organized, and the receipt of significant federal benefits turns on the decision." *CVMT II*, 515 F.3d at 1268. Noting that the Tribe

had a potential membership of 250, *id*. at 1265, the Court rejected the Burley

faction's "antimajoritarian gambit [that] deserve[d] no stamp of approval from the

Secretary," *id*. at 1267.

> **b.    The Yakima Dixie faction's challenge to the
> 2011 Echo Hawk Decision**

In 2011, Interior temporarily reversed its support for the organization of a

larger tribal community under the IRA.  AS-IA Larry Echo Hawk decided on

August 31, 2011 ("Echo Hawk Decision") that it was legally improper for Interior

to compel the Tribe to increase its membership and agreed to conduct government-

to government relations with a Tribe comprised of Burley, her three relatives, and

Yakima Dixie.  JA___ [ECF 34-32].

Although Yakima Dixie himself was included, he believed that others were

also entitled to tribal membership.  Mr. Dixie and others allied with him (including

Plaintiff Michael Mendibles) challenged the Echo Hawk Decision.  *See* Complaint,

California Valley Miwok Tribe v. Salazar, No. 11-cv-160, ECF 1 (filed Jan. 24,

2011).  The district court rejected the Echo Hawk Decision as arbitrary and

capricious.  *CVMT III*, 5 F. Supp. 3d at 99-101.  The court emphasized Interior's

repeated recognition that "the Tribe consisted of a loosely knit community of

Indians in Calaveras County" which includes "at least 250 individuals."  *Id.* at 98

(internal quotation marks omitted).  The court remanded the matter to Interior.

c. **The Burley faction's challenge to the 2015 Washburn Decision**

In 2013, Yakima Dixie and his allies (including Michael Mendibles), claiming to represent "the full Tribal community," asked BIA to approve their proposed 2013 Constitution, which was supported by 90 votes in an election in which 100 of 200 eligible members voted.[9] JA___ [ECF 34-36 at 2]; JA___ [ECF 34-37 at 2]; JA___ [ECF 34-38 at 3]. The 2013 Constitution afforded membership to "lineal descendant[s] of … the 14 persons with whom the Federal government conducted official business with the Tribe between 1915 and 1967," and the persons identified as "Me-wuk" on the 1929 Census (134 people) and their lineal descendants. JA___ [ECF 34-36 at 4]. The 2013 Constitution explained that BIA called the first group "Putative Members" but that "many other members came and went from the Sheep Ranch Rancheria over the decades after 1915" as "the Tribe existed as a network of related families with regional ceremonies." JA___ [id. at 2].

AS-IA Kevin Washburn issued a decision on December 30, 2015, addressing the individuals or groups eligible to organize the Tribe. JA___ [ECF 34-43]. He reviewed the historical record of the Sheep Ranch Rancheria and the

---

[9] In its Opinion denying Plaintiffs' motion for preliminary injunction, the district court below detailed how Michael Mendibles "and several other Plaintiffs recognized, welcomed, and defended" the inclusion of 1929 Census descendants in the Tribe in the 2013 Constitution and subsequent efforts. JA___ [ECF 40 at 10].

14

Miwok community in Calaveras County, JA___ [*id*. at 2-4], noting that "the Federal Government purchased a one acre lot in the town of Sheep Ranch for the benefit of the Indians identified by Terrell," JA___ [*id*. at 3].  He also considered the relevant judicial decisions (*CVMT I*, *CVMT II*, and *CVMT III*), all of which concluded that "there are far more than five people eligible to take part in the organization of the Tribe."  JA___ [*id*. at 5].  Washburn identified the Tribe's membership "for purposes of reorganization" to include three "Eligible Groups": (1) descendants of those listed on the 1915 Census; (2) descendants of Jeff Davis (who resided on the Rancheria in 1935); and (3) heirs of Mabel Dixie (who resided on the Rancheria in 1967) and their descendants.  *Id.*  Washburn explained that it "may be proper" to include the descendants of those listed on the 1929 Census in light of Terrell's observation that the Calaveras County Miwoks are "to some extent … interchangeable in their relations," but left the decision whether to include the 1929 Census descendants to the Eligible Groups.  JA___ [*id*. at 6].

Although the Burley family was believed to be eligible to participate in the Tribe's organization as Jeff Davis descendants, they still challenged the 2015 Washburn Decision because it included others.  *See California Valley Miwok Tribe v. Zinke*, No. 16-cv-1345, 2017 WL 2379945 (E.D. Cal. June 1, 2017) ("*CVMT IV*").  The district court rejected that challenge, concluding that Washburn was fulfilling Interior's obligation to ensure representation of the Tribe as a whole and

15

that his decision was not arbitrary and capricious. *Id*. at *8. The district court explained that Interior "properly exercises discretion not to approve a governing document when it does not 'reflect the involvement of the whole tribal community.'" *Id*. at *7 (quoting *Aguayo v. Jewell*, 827 F.3d 1213, 1224 (9th Cir. 2016)). The Ninth Circuit affirmed. *California Valley Miwok Tribe v. Zinke*, 745 F. App'x 46, 47 (9th Cir. 2018) ("*CVMT V*") (Assistant Secretary permissibly determined that "the Tribe was not reorganized, that its membership is not limited to five individuals, and that the United States does not recognize leadership of the tribal government").

## C.     The Newland Decision

After Yakima Dixie's death in 2017, Plaintiff Michael Mendibles took over as spokesperson for those allied with him, and in 2018 submitted a petition asking BIA to hold a Secretarial Election for the proposed 2018 Constitution. JA___ [ECF 34-46]. Consistent with the 2015 Washburn Decision, those petitioning included persons in the three Eligible Groups, which totaled 289 eligible voters. JA___ [ECF 34-48]. The 2018 Constitution, like the 2013 Constitution, also included lineal descendants of Miwok on the 1929 Census as eligible tribal members. JA___ [ECF 34-50 at 5]. The 2018 Constitution was ratified on April 15, 2019 "by a vote of 143 for and 12 against." JA___ [ECF 34-59].

16

Shortly before the election, Plaintiff Leon Mendibles questioned the eligibility of John Jeff's many descendants to vote under the Washburn Decision. JA___ [ECF 34-52] (Jan. 18, 2019 letter).  Two other Plaintiffs—Marie Diane Aranda and Yolanda Fontinalla—filed suit on April 9, 2019 to enjoin the John Jeff descendants from voting.  *Aranda v. Sweeney*, No. 19-cv-613 (E.D. Cal. filed Apr. 9, 2019).  They provided new evidence that the many individuals thought to be in the Eligible Group of descendants of Jeff Davis were not actually his descendants, because their ancestor, John Jeff, was not actually Jeff Davis's son, as had been believed.  JA___ [ECF 34-62 at 64] (Beckham Report).  As noted, John Jeff was on the 1929 Census but not on the 1915 Census.

On May 30, 2019, Interior's Office of Federal Acknowledgment confirmed that John Jeff was not Jeff Davis's son.  JA___ [ECF 34-64].  This new evidence substantially changed the effect of the Washburn Decision: eligibility to participate in the Secretarial Election became limited to a small group of approximately 10 people—the living descendants of the 1915 Census (the first Eligible Group) and perhaps another person in the third Eligible Group—excluding many people who had long participated in the tribal community.[10]  In light of the corrected

---

[10] In addition to the nine Plaintiffs, Rosalie Russell's daughter Noelani Marie Russell claims to descend from Lena Hodge Shelton but is not identified in the Complaint as a plaintiff.  *See* JA___ [ECF 28-9].  Merle Butler's descendant Dequita Boire appears to be the sole person in Washburn's third Eligible Group—

17

genealogy, the Regional Director issued a decision that same day invalidating the election because "most of the participating individuals did not meet the requirements to be considered eligible to participate." JA___ [ECF 34-65].

BIA again initiated the organizational process in late 2021. *See* JA___ [ECF 34-78 at 5] (Newland Decision). AS-IA Bryan Newland paused the organizational process following receipt of arguments by John Jeff's descendants "that disqualification of this group based on newly corrected genealogical information was contrary to the plain intent of the Washburn Decision." *Id.*; JA___ [ECF 34-67] (meeting request). In light of the genealogical correction, Newland issued his decision revising the Washburn Decision on May 31, 2022. JA___ [ECF 34-78]. He added a fourth Eligible Group—descendants of Miwok Indians on the 1929 Census. JA___ [*id.* at 3]. This addition included John Jeff's descendants, who had long been active participants in the tribal community.

Newland explained that "nearly all" the people on the list of eligible voters presented to BIA in the 2018 Petition for a Secretarial Election descended from John Jeff. JA___ [*id.* at 4]. BIA had evidence that John Jeff was the son of Jeff Davis and "thus that the descendants of John Jeff qualified as members of the Eligible Groups under the Washburn Decision." *Id.* "Additionally, the actions of the greater Tribal community evidenced a widespread belief that the descendants

---

"heirs of Mabel Dixie … and their descendants." *See supra* pp. 9-10. Velma Whitebear was a devisee of Yakima Dixie, not a descendant. *Id.*

of John Jeff constituted a portion of the greater Tribal community, such as including descendants of John Jeff in both a 2013 tribal election to adopt a constitution and the 2018 Part 81 petition." *Id*. Indeed, "[t]he evidence before the Department in 2015 indicated that John Jeff's descendants comprise *nearly the entirety of the greater Tribal community*," "[m]any of [whom] have participated in Tribal affairs for decades." *Id*. (emphasis added). But the Office of Federal Acknowledgment determined on May 30, 2019 that that belief was incorrect. *Id*. at 4-5

After analysis of the record, he agreed that Washburn had understood that John Jeff was Jeff Davis's son based on the record "replete with evidence indicating that John Jeff was a descendant of Jeff Davis." JA___ [*id.* at 5]. And Newland further concluded that "[b]oth the record and [Washburn's] decision indicate his understanding that [John Jeff's descendants] would be included in the organizational process." *Id*. Thus, "[b]y revising the Washburn Decision to include the descendants of individuals on the 1929 Census as an eligible group, the Department again recognizes the greater Tribal community eligible to organize the Tribe based on the Eligible Groups' previous efforts to organize." JA___ [*id.* at 6].

## D.  District Court Proceedings

In June 2022, Plaintiffs filed a complaint for declaratory and injunctive relief challenging the 2022 Newland Decision under the APA on the asserted ground that

19

it "wrongfully changed the groups of individuals eligible to participate in the organization of the California Valley Miwok Tribe." JA___ [ECF 1 ¶ 1 at 3]. In Count I, Plaintiffs claimed that "[t]he Newland Decision is arbitrary and capricious" agency action under the APA, 5 U.S.C § 706(2)(a), because it assertedly "failed to provide a reasoned explanation for reversing the Washburn Determination" and "the record belies the conclusion in the Newland Decision." JA____ [id. ¶ 80 at 15-16]. In Count II, Plaintiffs claimed that Interior "unlawfully withheld or unreasonably delayed" the "Tribe's organizational efforts" in violation of the APA, 5 U.S.C. § 706(1). JA___ [id. ¶¶ 83–86 at 16].

In November 2023, the district court denied Plaintiffs' motion for preliminary injunction to halt the Tribe's organization process. JA___ [ECF 40]. Among other reasons, the court noted Plaintiffs' "unequivocal about-face": "the inescapable reality is that Plaintiffs are asking the Court to hold the same eligibility criteria they proposed and defended over several years now constitutes an irreparable" injury to the Tribe. JA____ [id. at 10-11].

The parties filed cross-motions for summary judgment. Plaintiffs argued that the Washburn Decision should govern the Tribe's organization such that they (the 1915 Census descendants) control the process. Specifically, they argued: (1) Washburn did not assume that John Jeff was Jeff Davis's son in defining the three groups eligible to organize the Tribe; and (2) even if he did, Newland did not

20

adequately explain the rationale for allowing 1929 Census descendants to participate in the Tribe's organization. *See* JA___ [Op. 18–19]. The Government countered both of those Count I arguments and argued that Plaintiffs had forfeited Count II by failing to present any argument about it in their summary judgment brief. ECF 38.

The district court held that Plaintiffs abandoned their second claim because their "subsequent briefs present[ed] no argument addressing how, why, or what agency action was unlawfully delayed or withheld." JA___ [Op. 16] (referencing ECF 28 and ECF 31).

The district court thoroughly reviewed the history of the Sheep Ranch Rancheria, the three prior actions relevant to the current dispute, and the Newland Decision. JA____ [Op. 3-15]. Based on that record review and analysis of the summary judgment briefs, the district court granted summary judgment to Interior on Count I. JA___ [Op. 30]. The district court rejected both of Plaintiffs' arguments: (1) that "Newland was wrong to conclude that Washburn assumed or relied on the belief that John Jeff descended from Jeff Davis," and (2) that "even if Washburn did proceed on that incorrect assumption, there is no rational connection between that finding … and Newland's choice to include descendants of the 1929 Census in the Eligible Groups." JA____ [Op. 18-19] (internal quotation marks omitted). The district court carefully explained why Plaintiffs' first argument

21

lacked merit, JA____ [Op. 19-24], and why their second argument lacked merit, JA____ [Op. 24-29].

In sum, the district court concluded that the Newland Decision "derives from reasonable efforts to ensure that the 'tribal government [would] fully and fairly involve the tribal members … including many people who Plaintiffs themselves had long recognized as members and even leaders of the Tribe (notwithstanding their efforts to exclude those same individuals now)." JA___ [Op. 2] (citing *Morris v. Watt*, 640 F.2d 404, 415 (D.C. Cir. 1981)). Plaintiffs "failed to carry [their] burden" "to prove that the BIA, in its attempt to prevent a factual error from reducing the Tribe to only *ten* individuals, acted outside 'the bounds of reasoned decisionmaking.'" JA___ [Op. 30] (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983)). To the contrary, "the BIA's lawful commitment to 'ensuring that the will of tribal members is not thwarted by rogue leaders' shines through in the Newland Decision and the administrative record supporting it." JA___ [Op. 30] (quoting *CVMT II*, 515 F.3d at 1267).

## SUMMARY OF ARGUMENT

I.     Plaintiffs fail to demonstrate that AS-IA Newland impermissibly revised AS-IA Washburn's 2015 decision providing for three Eligible Groups of potential members to participate in the organization of the Tribe. This Court

should thus uphold the Newland Decision under the APA's deferential arbitrary-and-capricious standard.

A.    Newland had authority to revisit the prior decision in light of the significant factual error discovered in 2019.  He reasonably concluded that Washburn had intended to include the larger tribal community in the Eligible Groups and that Washburn believed he had done so based on the understanding that John Jeff was the son of Jeff Davis (a tribal ancestor identified in both the first and second Eligible Groups).  The district court's well-reasoned rejection of Plaintiffs' arguments on this point should be affirmed.

B.    The Newland Decision reasonably revised the Washburn Decision to include the descendants of individuals on the 1929 Census, almost all of whom were descendants of John Jeff.  By the time the genealogical error was discovered, the tribal community had already twice voted to include 1929 Census descendants as members of the Tribe.  The Newland Decision reasonably explained the rationale for the revision.  The district court's well-reasoned rejection of Plaintiffs' arguments on this point should similarly be affirmed.

C.    Plaintiffs' new argument that the Newland Decision violated *CVMT III* should be rejected at the threshold as procedurally improper.  In any event, it lacks merit.  In *CVMT II*, this Court had rejected a similar "antimajoritarian gambit" by a different small group, and, consistent with *CVMT II*, the district court

23

in *CVMT III* again protected the right of the larger tribal community to participate in the Tribe's organization.  Plaintiffs' claim to be a select group of "putative members" who have the exclusive right to organize the Tribe by virtue of their descent from individuals on the 1915 Census has no basis in the IRA, its implementing regulations, or the BIA's practice for assisting tribes to organize.

D.      Plaintiffs' effort to inject into this case disputes involving Silvia Burley, a descendant of John Jeff, should be rejected.  Although the Newland Decision affects her—like all John Jeff descendants—her specific status is irrelevant to whether AS-IA Newland permissibly added 1929 Census descendants as a group eligible to participate in the Tribe's organization.

E.      Plaintiffs' improper argument that the Newland Decision should be invalidated because AS-IA Washburn was assertedly more knowledgeable about Indian affairs than AS-IA Newland should be rejected out of hand.

II.     Newland's 2022 revision of the 2015 Washburn Decision was not untimely.  Plaintiffs forfeited their Count II claim under 5 U.S.C. § 706(1) (that Interior unreasonably delayed the Tribe's organizational efforts) by failing to develop an argument in their summary judgment briefs.  And their new argument that Newland unreasonably delayed revising the Washburn Decision is improperly presented for the first time on appeal and lacks merit.  Neither the APA's six-year statute of limitations for judicial challenges to agency actions, 28 U.S.C. § 2401(a),

24

nor Interior's administrative appeal regulations, 25 C.F.R. Part 2, is applicable to the timeliness of Newland's decision.  Newland permissibly reconsidered the Washburn Decision within a reasonable time after the new genealogical information was discovered in 2019.

III.    Plaintiffs misplace reliance on the doctrine of issue preclusion. Plaintiffs cannot raise this argument for the first time on appeal.  And the doctrine has no applicability to Newland's revision of the Washburn Decision in light of newly discovered evidence.

## STANDARD OF REVIEW

This Court reviews the district court's order on cross-motions for summary judgment *de novo*.  *See Defenders of Wildlife v. Zinke*, 849 F.3d 1077, 1082 (D.C. Cir. 2017).

The APA directs the Court to uphold an agency's decision unless the Court finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Although the inquiry must be thorough, the standard of review is "deferential, and a court may not substitute its own policy judgment for that of the agency."  *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  The Court need not find that an agency decision "is the only reasonable one, or even that it is the result [the court] would have reached." *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983).

25

And particularly where matters are within the agency's expertise, a court is only to assess whether the decision is "within the bounds of reasoned decisionmaking." *Balt. Gas & Elec. Co.*, 462 U.S. at 105.  "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423.

## ARGUMENT

**I.    The Newland Decision reasonably revised the Washburn Decision in response to new genealogical evidence.**

Plaintiffs fail to meet their burden under 5 U.S.C. § 706(2)(A) to demonstrate that the Newland Decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  This Court should affirm the district court and uphold the Newland Decision.

First, AS-IA Newland had authority to revise the Washburn Decision based on the new evidence that John Jeff was not Jeff Davis's son.  Although "Congress ... can limit an agency's discretion to reverse itself," "the power to decide is normally accompanied by the power to reconsider." *Nat. Res. Def. Council v. Regan*, 67 F.4th 397, 401 (D.C. Cir. 2023) (internal quotation marks omitted); *see also Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014).  Congress has given Interior broad authority over Indian affairs, 25 U.S.C. § 2, and Plaintiffs point to no provision of the IRA or any other statute that limited Newland's

26

authority to reconsider the eligibility criteria for potential tribal members to participate in the initial organization of the Tribe.

Second, in exercising his authority, Newland "reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423. As explained above (pp. 11-16), courts, including this Court, had rejected prior efforts by a small faction of the Tribe (the Burley faction) to exclude the larger Miwok community in Calaveras County—believed to include about 250 people—from the organization of the Tribe. Consistent with these decisions, Washburn in 2015 defined three Eligible Groups. The tribal community, including the large group of John Jeff descendants, then proceeded in 2018 to draft a tribal constitution that allowed the whole community—including 1929 Census descendants—to be tribal members.

When it turned out in 2019 that the great majority of potential tribal members were not actually eligible to participate in the organization of the Tribe under the Washburn criteria—because John Jeff was not Jeff Davis's son—they urged Newland to modify the Washburn Decision to include the 1929 Census descendants. Plaintiffs—the few potential members who remained eligible under the Washburn Decision—sought to take advantage of the genealogical error. This Court in *CVMT II* rejected a similar "antimajoritarian gambit." 515 F.3d at 1267.

27

Its direction to Interior to "ensur[e] that the will of tribal members is not thwarted by rogue leaders," *id*., supports the Newland Decision.

As explained below, Plaintiffs fail to show any error in the district court's well-reasoned rejection of their two arguments challenging the Newland Decision as arbitrary and capricious. As the district court concluded, AS-IA Newland reasonably decided to correct the genealogical error material to the Washburn Decision by adding 1929 Census descendants as a fourth group eligible to participate in the Tribe's organization.

The Opening Brief instead focuses on several arguments that Plaintiffs did not develop in the district court. Those new arguments are addressed in Parts I.C, I.D, and I.E below.

### A. Newland reasonably revisited the Washburn Decision in light of the new conclusion that John Jeff was not Jeff Davis's son.

AS-IA Newland reasonably concluded that the Washburn Decision was based on the misunderstanding that John Jeff was the son of Jeff Davis, and revisited the decision after this error was discovered. The district court properly rejected Plaintiffs' argument that the genealogical error—which disenfranchised most of the potential members eligible to organize the Tribe—was not a valid basis for Newland to revisit the Washburn Decision because Washburn assertedly had not relied on the erroneous understanding that John Jeff was Jeff Davis's son. As

28

the district court found, "[a]mple evidence in the record supports Newland's

conclusion that Washburn, like many others, understood John Jeff to be the son of

Jeff Davis," and that "this understanding informed [Washburn's] delineation of the

Eligible Groups for organization purposes."  JA___ [Op. 19]; *see* JA____ [Op. 19-

24] (detailing the analysis).  The court observed that this newly discovered "factual

inaccuracy," if left uncorrected, "would produce immense unintended outcomes."

JA___ [Op. 24].

On appeal, Plaintiffs assert that Newland had no reason to revisit the

Washburn Decision.  Opening Br. 6 (statement of Issues II and III); *id*. at 47 ("The

genealogy of John Jeff or any person named on the 1915 Census was not

fundamental to naming the Eligible Groups."); *id*. at 48 (referring to "AS-IA

Newland's assumption about the intention of AS-IA Washburn" as "speculation").

But they make no effort to refute the "ample evidence" discussed by the district

court demonstrating Washburn's reliance on the understanding that John Jeff was

Jeff Davis's son.  *See* JA___ [Op. 19-24].  The mere assertion of an argument

without supporting analysis is insufficient to present the argument.  Plaintiffs have

thus forfeited this argument by failing to adequately develop it in their Opening

Brief.  *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) (a

party forfeits an argument when it mentions an argument in a "skeletal way" in an

opening brief but fails to adequately develop it).  But in any event, if the Court

were to reach this issue, it should uphold the district court's well-reasoned conclusion.

**B. Newland reasonably corrected the genealogical error by adding 1929 Census descendants as a group eligible to participate in the Tribe's organization.**

The district court also rejected Plaintiffs' argument that allowing 1929 Census descendants to participate in the Tribe's organization was not a permissible way to correct the genealogical error. JA___ [Op. 24-29]. The court correctly focused on the importance of including the larger tribal community in the Tribe's organization, an objective that was repeatedly emphasized in prior judicial decisions and in Washburn's decision. JA___ [Op. 25] ("it was incumbent upon Newland to ensure that the organizational process 'reflect[ed] the will of a majority of the tribal community'") (quoting *CVMT I*, 424 F. Supp. 2d at 202). Thus, Newland "reasonably based his decision at least in part on the Eligible Groups' previous efforts to organize" including the votes approving the 2013 Constitution and 2018 Constitution, both of which included 1929 Census descendants as members. JA___ [Op. 25-26] (cleaned up).

The court properly pointed out that "many of the Plaintiffs," notably Michael Mendibles, "vehemently opposed attempts to limit the Tribe to a handful of people," and specifically supported "a tribal community that included the 1929 Census descendants." JA___ [Op. 26]. And it emphasized that the Washburn

Decision recognized that including the 1929 Census descendants "*may be proper.*" JA___ [Op. 27]. At that time, it was understood that the overwhelming number of 1929 Census descendants were John Jeff descendants who were believed to be included in Washburn's Eligible Groups. JA___ [Op. 27] (noting record evidence, including 2017 finding that "only 17 individuals from 1929 Census [were] not in Eligible Groups").[11]

The court thus properly rejected "Plaintiffs' central argument" that tribal membership depends on descent from the 1915 Census, stating that it "fails to find a foothold in the historical record strong enough to establish that Newland's decision was irrational." JA___ [Op. 28]. Indeed, the district court characterized as "somewhat overwhelming" the evidence that from 1915 to the present the Tribe has been a "broad community" that includes 1929 Census descendants. JA___ [Op. 28-29]; *see* JA___ [Op. 3-12] and *supra* pp. 4-10 (summarizing the evidence).

In sum, the district court correctly concluded that Newland's decision to revise the Washburn Decision by including the 1929 Census descendants among the Eligible Groups to organize the Tribe was not arbitrary and capricious: "The BIA acknowledged the change it was making, provided sensible reasons for doing so, and there is nothing in the record or the Newland Decision reflecting a

---

[11] In addition, Plaintiffs have acknowledged that "virtually all" of the persons on the registered voters list for the 2019 Secretarial Election based their eligibility on descent from John Jeff. ECF 56 at 3 (Aranda challenge to Secretarial Election).

'fail[ure] to consider an important aspect of the problem' nor 'an explanation …
that runs counter to the evidence before the agency.'"  JA___ [Op. 29] (quoting
*Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43
(1983)).

On appeal, Plaintiffs fail to show any error in the district court's decision.
Plaintiffs present two limited arguments that the district court erred in rejecting the
arguments they presented to it.  First, they reiterate their reliance on *CVMT III*, 5 F.
Supp. 3d at 89, in support of their claim that 1915 Census descendants have a
privileged status in the Tribe.  Opening Br. 11 n.6.  That passage cannot bear the
weight Plaintiffs place on it.  As "Factual Background," *CVMT III* described the
acquisition of the Sheep Ranch Rancheria:

> In 1915, an agent working for the Office of Indian Affairs (now the
> BIA) was tasked with locating a group of Indians known at the time as
> the "Sheepranch Indians."  In reporting back to the Office of Indian
> Affairs, the agent noted that while the Sheepranch Indians had once
> been part of "a large band of Indians," the band had dwindled down to
> "13 in number ... living in and near the old decaying mining town
> known and designated on the map as 'Sheepranch.'"  In 1916, the BIA
> acquired approximately 0.93 acres in Calaveras County, California for
> the benefit of these Indians.  The land became known as the "Sheep
> Ranch Rancheria" and was held in trust for the Indians by the Federal
> government.

*CVMT III*, 5 F. Supp. 3d at 88-89 (administrative record citations omitted).  This
passage is fairly read to say that the BIA acquired the parcel with the expectation
that it would be used by the Indians listed on the 1915 Census, but it does not

32

appear that the court intended the broader conclusion that lawful use of the parcel was to be forever limited to the individuals listed on the 1915 Census and their descendants. The federal government never viewed the acquisition in that way. The parcel was acquired in the name of the United States as part of a broad effort to provide for California Indians. *See supra* p. 6. In addition, as explained above (pp. 7-10), and as found by the district court below, JA___ [Op. 3-6], the BIA subsequently allowed Miwoks who were not 1915 Census descendants to live on the parcel, and the United States currently holds the land in trust for the benefit of the descendants of Mabel Dixie's heirs, who are not 1915 Census descendants. Plaintiffs do not dispute these facts. It was thus reasonable for Newland to conclude that the circumstances of the 1916 acquisition did not give 1915 Census descendants the exclusive right to decide on the organization and membership of the Tribe.

Second, Plaintiffs argue that "Newland's decision does not deserve deference, as implied in the *Cobb* decision." Opening Br. 34 (citing the district court's decision denying the Burley faction's motion for preliminary injunction in *California Valley Miwok Tribe v. Haaland*, No. 24-cv-947, 2024 WL 4345787 at *2 (D.D.C. Sept. 30, 2024)). The district court in that case referenced the district court's holding below that the Newland Decision was not arbitrary and capricious (Op. 2). Plaintiffs then reference *Loper Bright Enterprises v. Raimondo*, 603 U.S.

369 (2024), which they say "struck down the *Chevron* doctrine that allowed deference to agency interpretation of law" so that the law will not "'change erratically.'"  Opening Br. 35 (quoting *Loper*, 603 U.S. at 412); *see also id*. at 36. Plaintiffs misplace reliance on *Loper*.  Newland did not interpret a statute, and the district court thus had no reason to address an agency interpretation of an ambiguous statute.  The district court applied the appropriate standard of APA review in concluding that Newland had reasonably modified the Washburn Decision based on new evidence.

This Court should thus affirm the district court for the reasons stated in its opinion.

> **C.     *CVMT III* does not mandate that 1915 Census descendants are "putative members" with the exclusive right to determine tribal membership criteria for all other potential members.**

On appeal, Plaintiffs materially change their argument.  The central argument in the Opening Brief is that the Newland Decision violates *CVMT III* (the "Remand Decision"), which they say requires a process by which a small group of potential members, who assertedly have special knowledge of the Tribe, draft a tribal constitution determining criteria for membership, which may include other potential members: "[I]t does not take many people to establish future member criteria, it takes the right people with the historic connection to the tribe.  The 1915 Census Washburn identified represents the right people.  Those few putative

34

members can constitute a tribal government structure that can then develop the criteria for future members of the Tribe." Opening Br. 55.

The district court below understood Plaintiffs to argue that the 1916 acquisition limited tribal "*membership* to … 1915 Census descendants alone." JA___ [Op. 27] (emphasis added); *see also* JA___ [Op. 28] (referencing Plaintiffs' "notion that the Tribe is limited to 1915 Census descendants alone"). Plaintiffs now blame Interior for "confus[ing] the lower court" into thinking they want to limit tribal *membership*, Opening Br. 41, when they only seek to limit eligibility to participate in the Tribe's organization under the IRA. The district court fairly characterized Plaintiffs' arguments made below. *See* ECF 28 and 31. Plaintiffs changed position on appeal, apparently realizing they were unlikely to succeed on their argument that the 1916 acquisition of the Rancheria limited tribal membership to their small group of 1915 Census descendants.

Trying to limit their claim, Plaintiffs now call themselves the "historical" descendants and "putative members" who have the exclusive right to draft a proposed tribal constitution. Opening Br. 4-7, 11, 16, 19-20, 32-33, 35, 38, 41, 43, 45, 46, 53, 55. Unlike in the district court, Plaintiffs acknowledge that there was (and is) an "[e]xtended [c]ommunity" of Miwoks in Calaveras County including 1929 Census descendants. *Id*. at 12; *id*. at 4 (acknowledging "a larger extended community"); *id*. at 41 (acknowledging the "broader community of Sheep

35

Ranch"); *id*. at 43 (acknowledging the "extended Sheep Ranch community").

Although Plaintiffs now acknowledge that some 1929 Census descendants may be entitled to membership in the Tribe, they argue that not all 1929 Census descendants have a sufficient "connection to the Sheep Ranch area of Calaveras County." *Id*. at 16. Plaintiffs, however, have not yet determined the specific criteria they would apply for differentiating eligible and ineligible 1929 Census descendants as they say they need to do historical research. *Id*. at 19, 33, 45.

This "putative members" argument is so different from Plaintiffs' argument below that this Court should reject it as an argument improperly raised for the first time on appeal. *Flynn v. Comm'r of Internal Revenue*, 269 F.3d 1064, 1068–69 (D.C. Cir. 2001). Plaintiffs' summary judgment briefs, ECF 28 and 31, do not contain the word "putative" or otherwise fairly present this argument. In any event, this new argument lacks merit.

The Opening Brief is replete with bare assertions that Newland's decision violates *CVMT III*, unsupported by citations to specific findings and conclusions in that decision.[12] It appears, however, that Plaintiffs primarily rely on the discussion

---

[12] Opening Br. 2-3 ("the BIA violated the remand and overstepped its role, by setting the future membership of the Tribe rather than establishing a *process*, leading to the development of a Tribal Constitution by the 'putative members'"); *id*. at 4 (Remand Decision "required a *process* to organize the Tribe composed of members with historical connections to the Miwok community located around Sheep Ranch Rancheria in Calaveras County, California"); *id*. at 30 (Newland Decision "violates the Remand Decision … because [it] lacks evidence that those

in *CVMT III* of BIA's efforts in 2004-2007 to deal with Silvia Burley's claim to lead a five-member Tribe, during which BIA used the terms "putative member" and "putative group" to describe the individuals who should participate in the organization of the Tribe. *See CVMT III*, 5 F. Supp. 3d at 95.

"Putative," as in "putative member" and "putative group," is not a term of art. The common definition of "putative" is "commonly accepted or supposed." https://www.merriam-webster.com/dictionary/putative. The provision of the IRA providing for the adoption of a tribal constitution through "a special election authorized and called by the Secretary," 25 U.S.C. § 5123(a)(1), does not create the position of "putative member." Nor do the implementing regulations, 25 C.F.R. Part 81. BIA does not generally refer to "putative" members or groups when dealing with the initial organization of tribes. As explained below, BIA coined the term when addressing Silvia Burley's 2004 attempt to organize a Tribe with only five members. Although Plaintiffs use the term "putative members" to mean a select group within a tribal community who will determine the membership

---

on the 1929 Census such as Silvia Burley or her family line had a historical connection to the Sheep Ranch Miwoks"); *id*. at 32-33 ("lower court did not follow the … Remand Decision"); *id*. at 36 ("Newland's modifications opened the door to those Miwoks of mixed blood and heritage without proven blood ties or historical connections to be members of the Tribe, violating the remand."); *id*. at 40 (the district court "fail[ed] to examine the prior federal court decisions, especially the *CVMT III* Remand Decision").

criteria for the tribe as a whole, BIA used the term to encompass the larger tribal community of potential members.

Plaintiffs misplace reliance on *CVMT III*, which is their sole legal support for their new theory. That decision, fairly read as a whole, *supports* the Newland Decision. Far from endorsing a small group of "putative members" controlling the Tribe's organization, the district court rejected the Burley faction's claim to "have the exclusive authority to determine citizenship of the Tribe." *CVMT III*, 5 F. Supp. 3d at 98 n.14. The court's invalidation of the Echo Hawk Decision and remand for reconsideration resulted in Washburn's decision, which Washburn believed to be compliant with *CVMT III*. Nor does the specific discussion of BIA's use of the term "putative group," *id*. at 95, support Plaintiffs' theory.

*CVMT III* recounted BIA's actions relating to the Burley faction's efforts to organize the tribe starting in 2004. In a March 26, 2004 letter to Silvia Burley, BIA emphasized its responsibility "to determine that the organizational efforts reflect the involvement of the whole tribal community" which Burley had not demonstrated. *Id*. at 93.[13] In a February 11, 2005 letter to Yakima Dixie, BIA stated that it did not recognize any governing body because the Tribe was not

---

[13] The letter expressed awareness of "Indian communities in and around the Sheep Ranch Rancheria," including persons who resided on or adjacent to the Rancheria in the last 75 years and their descendants or heirs, persons with "cultural contact with Sheep Ranch," and "a larger group of Indians residing less [than] 20 miles away at West Point." JA___ [ECF 34-20 at 3].

organized.  *Id*. at 93-94.  This letter appears to be BIA's first use of the term "putative tribal members."[14]  In a November 6, 2006 decision, BIA proposed to publish a notice in newspapers in the "Miwok region" inviting "members of the Tribe and potential members" to a meeting to "initiate the reorganization process." *Id*. at 94; *see* JA___ [CVMT 1865] (referenced at Opening Br. 23-24).  In an April 2, 2007 decision, BIA explained that the meeting's purpose "was to identify the 'putative' group of individuals who believe they have the right to participate in the organization of the Tribe."[15]  *CVMT III*, 5 F. Supp. 3d at 95.

On April 11, 2007, BIA then posted a notice inviting "putative members" to participate in the Tribe's organization, specifically including descendants of those on the 1915 Census, Jeff Davis who voted on the IRA in 1935, and Mabel Hodge Dixie who voted on the distribution of assets plan in 1964.  JA___ [CVMT 2116] (cited at Opening Br. 6, 11, 24, 31).

References to "putative members" in the above BIA documents dating from 2004 to 2007 are thus best interpreted to mean the larger tribal community.

---

[14] That letter "encourage[d] … efforts to organize the Tribe along the lines outlined in the March 26, 2004, letter," and advised that "[t]he first step in organizing the Tribe is identifying putative tribal members."  JA___ [ECF 34-21 at 3].  In the context of this letter, "putative" is reasonably interpreted to mean the "whole tribal community."

[15] More precisely, BIA stated that "the 'putative' group, who would be entitled to participate in the Tribe's efforts to organize a government that will represent the Tribe as a whole," is "the whole community."  JA___ [CVMT 2113].

This interpretation is buttressed by *CVMT III*'s reliance on the record evidence "that the Tribe's membership is potentially significantly larger than just these five individuals."  5 F. Supp. 3d at 98.  That evidence included the BIA's recognition since at least 1997 "that the Tribe consisted of a loosely knit community of Indians in Calaveras County … that … consisted of at least 250 individuals."  *Id*. (internal quotation marks omitted).  Notably, "[t]he BIA received genealogies from at least 242 individuals in response to the notice it placed in the newspapers in 2007."  *Id*.  And the court noted that this Court "took judicial notice that the potential membership of the Tribe consisted of 250 individuals."  *Id*. (citing *CVMT II*, 515 F.3d at 1265).  Given *CVMT III*'s reliance on the robust response to the 2007 call for "putative" members, which was consistent with estimates of potential tribal membership, it is not fair to read *CVMT III* as supporting Plaintiffs' claim that their small group of 1915 Census descendants properly holds exclusive authority to define the Tribe's membership.

Plaintiffs assert that *CVMT III* "determined a *process* for the organization of the Tribe, that did not allow the Federal government to decide the membership of the tribe nor name every Miwok in Calaveras County in 1929 as a member." Opening Br. 41; *id*. at 43 (Washburn Decision complied with the Remand Decision "by determining who were the eligible 'putative' members with the historical heritage to Sheep Ranch to organize a Tribal government").  But neither Washburn

nor Newland purported to make the ultimate determination of tribal membership. During the process of drafting a tribal constitution, the potential members are free, if they choose, to establish membership criteria that could exclude some part of the 1929 Census descendants. It was their decision to include 1929 Census descendants in the Tribe in the 2013 Constitution and 2018 Constitution.

Plaintiffs try to bolster their "putative members" theory with a claim to have special knowledge of the Tribe's history by virtue of their 1915 Census ancestors. Opening Br. 32, 42. Plaintiffs suggest that residence on or near the Rancheria is a criterion. *See* Opening Brief 12-15 (questioning whether Miwoks located in other parts of Calaveras County, such as Altaville, Angels Camp, Murphys, Vallecito, and West Point, qualify for membership). Opening Br. 12-15. But, as explained above (pp. 7-10), since 1940, the people with the most demonstrable association with the Rancheria itself are not 1915 Census descendants. And their current acknowledgment of an extended Miwok community in Calaveras County undercuts their suggestion that residence in these locations should be disqualifying. After more than 25 years of efforts to organize the Tribe, they have never articulated the criteria they would use to differentiate Miwoks who deserve membership from those who do not. And, of course, any special knowledge they possess previously led some Plaintiffs to support the inclusion of 1929 Census descendants in the Tribe's membership.

41

Nor is there evidentiary support in the record for this claim to special knowledge first made on appeal. Plaintiffs have not demonstrated that they are more entitled to develop and apply membership criteria than 1929 Census descendants.[16] Their claim of special knowledge is belied by their admission that they would have to research genealogical relationships and historical connections to other federally recognized Indian tribes "(perhaps with the assistance of the BIA)" in order to "develop[] criteria for the future membership of the Tribe." *See* Opening Br. 45; *id*. at 19, 33 (same).

Plaintiffs argue at length that connections with surrounding Miwok tribes may disqualify some Calaveras County Miwoks from membership in the Tribe. They explain that the United States may recognize more than one sovereign tribe whose members descend from a common indigenous linguistic/cultural group. Opening Br. 8-10. And they point out that there are several recognized Indian tribes with members of Miwok ancestry. *Id*. at 8. Plaintiffs overstate the significance of this issue. Tribal constitutions typically preclude membership if an otherwise eligible person is enrolled in another federally recognized tribe. *See*, *e.g.*, JA___ [ECF 34-36 at 5] (2013 Constitution), JA___ ECF 34-50 at 6 (2018

---

[16] Based on their November 2022 affidavits in this case, it appears that Plaintiffs Marie Diane Aranda, her sister Yolanda Fontanilla, and Yolanda's son Joshua Fontanilla reside in Hawaii. JA___ [ECF 28-5]; JA___ [ECF 28-7]; JA___ [ECF 28-11].

Constitution).  Plaintiffs have not shown that the broader group is less capable of establishing a constitution that screens out potentially eligible members already enrolled in another tribe.  In any event, even if Plaintiffs can identify reasonable alternatives to the Newland Decision, this does not mean that the decision was arbitrary and capricious.  *See Am. Paper Inst.*, 461 U.S. at 422 (court need not find that an agency decision "is the only reasonable one, or even that it is the result [the court] would have reached.").

Finally, Plaintiffs misplace reliance on the reference to the trust obligation in *CVMT III*.  Plaintiffs assert that "[t]he Eligible Groups should determine the criteria for membership of collateral descendants, by reviewing other documents, records or census, that prove the potential members connection to the unorganized but existent Sheep Ranch community."  Opening Br. 33.  And they argue that, consequently, the decision below should be reversed for the same reason that *CVMT III* invalidated the Echo Hawk Decision: it was not consistent with the federal government's "distinctive obligation of trust" to the Tribe.  *Id.* (quoting *CVMT III*, 5 F. Supp. 3d at 100).  Plaintiffs have it backwards.  The Echo Hawk Decision was invalidated because it failed to determine whether CVMT's membership was properly limited to just five people.  *CVMT III*, 5 F. Supp. 3d at 99.  Here, AS-IA Newland appropriately responded to the genealogical error underlying the Washburn Decision which, if uncorrected, would have resulted in a

similarly small group controlling the membership criteria for the Tribe to the exclusion of many people who had long been involved in the Tribe's organization.

### D. Plaintiffs' arguments about Silvia Burley are not properly presented in this case.

Plaintiffs devote much of the Opening Brief to Silvia Burley's family history and her actions since 1998. Opening Br. 7, 14-18, 20-25, 30-31, 33, 36, 42-43, 45. They acknowledge that Silvia Burley descended from John Jeff. *Id*. at 17-18, 30. But they argue that she nonetheless was "not part of the Sheep Ranch community." *See*, *e.g.*, *id*. at 15, 17. And they recount her "bad acts" and many disputes with members of the Sheep Ranch community beginning in 1998. *See*, *e.g.*, *id*. at 7 (putative members must organize the Tribe to prevent "corruption" by "Silvia Burley and others with little historical connection to Sheep Ranch"); *id*. at 16 (Burley's "bad acts are the reason the 1915 descendants have resisted[] allowing Miwoks with no historical connection to Sheep Ranch being named members"); *id*. at 17 (Burley took "federal funding and revenue sharing funding provided to Sheep Ranch Rancheria for herself"). But this Court need not make any findings about these matters because they are irrelevant to whether the Newland Decision reasonably modified the Washburn Decision to include 1929 Census descendants

in the organization of the Tribe in response to the discovery that John Jeff was not Jeff Davis's son.[17]

Contrary to Plaintiffs' characterization, the Washburn Decision was not a "decision to exclude the Burley family from the Eligible Groups." *Id*. at 31. That was the *effect* of the Washburn Decision once it was later determined that John Jeff was not Jeff Davis's son, but the Washburn Decision expressly allowed the Burley family to "demonstrate that they are part of the Eligible Groups." JA___ [ECF 34-43 at 6]. Nor was Silvia Burley's individual eligibility a factor in Newland's decision. He was concerned with the *group* of 1929 Census descendants, not with Silvia Burley in particular. JA___ [ECF 34-78]. It is thus not necessary to address Plaintiffs' many factual assertions about Ms. Burley's pre-1998 connection to the Sheep Ranch community and her acts thereafter because they are irrelevant.

Plaintiffs discuss two pending cases filed by Silvia Burley and family members, but neither case is relevant to this Court's consideration of the Newland

---

[17] In support of their motion for summary reversal, filed November 25, 2024, Plaintiffs submitted documents relating to Silvia Burley that were not included in the district court record. In an Order dated February 27, 2025, this Court denied Plaintiffs' request to supplement the record on appeal for failure to seek such relief in the district court. The Court also denied their request for judicial notice because Plaintiffs "fail[ed] to identify facts that may be judicially noticed under Federal Rule of Evidence 201(b)" and "further fail[ed] to demonstrate that the records they ask this court to judicially notice are relevant to the disposition of either the motion for summary reversal *or this appeal*." *Id*. (emphasis added). Disregarding that Order, Plaintiffs resubmitted these documents (Exhibits A-D) on April 8, 2025 and improperly reference them in the Opening Brief.

Decision.  *See* Opening Br. 17-18, 30.  In California Valley Miwok Tribe v.

Haaland, No. 24-cv-947, ECF 1 (D.D.C. filed Apr. 2, 2024), the Burley faction

sought to enjoin BIA's efforts to assist the Tribe's organization pursuant to the

Newland Decision, specifically challenging BIA's use of the Certificate of Degree

of Indian Blood form to determine eligibility to vote on the proposed tribal

constitution.  The district court denied their motion for preliminary injunction.  *Id*.,

ECF 24 (filed Sept. 30, 2024).  In Burley v. Haaland, No. 24-cv-2455, ECF 1

(D.D.C. filed Aug. 23, 2024), the Burley faction sought to enjoin the impending

Secretarial Election on the ground that the Election Petition was submitted by

persons they consider to be nonmembers.  In status reports filed in both cases on

December 2, 2024, the Government informed the court that the Tribe's Secretarial

Election was held on October 1, 2024, and that BIA's Pacific Regional Director

approved the Constitution on October 28, 2024.[18]  On December 4, 2024, the

district court stayed these cases pending the resolution of this appeal: "The pending

appeal challenges the validity of a 2022 BIA decision; this case challenges certain

steps the BIA took in implementing that decision.  Thus, if appellants succeed,

there is a substantial possibility that the present case would be moot."  If the

---

[18] The proposed Constitution was adopted by a vote of 137 for and 0 against, with
11 ballots found to be spoiled.
https://www.bia.gov/sites/default/files/media_document/cvmt_election_results.pdf.

Government succeeds, the district court will address any extant issues in these cases.

### E.     Plaintiffs' personal criticisms of AS-IA Newland are inappropriate.

Plaintiffs improperly argue that the Newland Decision should be set aside because AS-IA Washburn was assertedly more knowledgeable than AS-IA Newland about "the rights of tribes to define their membership, and the intermingled ancestry of most Native American Communities."  Opening Br. 41; *see id*. at 44-47 (discussing Washburn's qualifications).  Courts review agency decisions under the APA based on the reasoning in the decision.  As demonstrated above (pp.30-34), Newland reasonably decided that the 1929 Census descendants—*i.e*., the extended Miwok community in Calaveras County—should be permitted to participate in drafting a tribal constitution that would define the criteria for tribal membership, and then to vote on the proposed constitution.  Newland appropriately gave effect to the principle that a tribe has the right to define its membership in the challenging context of the Tribe's long-running leadership and membership disputes.  Further, the suggestion that Newland—an active citizen and leader of the Bay Mills Indian Community—does not understand Native American communities is unfounded.

Plaintiffs' additional argument that "AS-IA Newland should have recused himself from making the 2022 decision" because he had worked for AS-IA Echo

47

Hawk when the 2011 Echo Hawk Decision was issued is similarly unwarranted. *See* Opening Br. 21 n.12. Plaintiffs incorrectly characterize the Newland Decision as an "attempt[] … to resurrect the Echo Hawk decision" by "allow[ing] Burley" to participate in the Tribe's organization. *Id*. As explained above (pp. 18-19), the Newland Decision expanded the group of eligible participants in the Tribe's organization to include all 1929 Census descendants, not just the small Burley faction that the Echo Hawk Decision recognized. And in any event, AS-IA Newland's prior work for the Department of the Interior does not give rise to any recusal obligation here.

## II.     Newland did not unreasonably delay the revision of the Washburn Decision.

This Court should reject all of Plaintiffs' unreasonable delay arguments.

As explained, Plaintiffs claimed in Count II that Interior "unlawfully withheld or unreasonably delayed" the "Tribe's organizational efforts," and sought to compel Interior under 5 U.S.C. § 706(1) to proceed with a Secretarial Election consistent with the Washburn Decision. JA___ [ECF 1 at 16-17]. The district court held that Plaintiffs had "abandoned" Count II by failing to present any argument in their summary judgment briefs (ECF 28 and 31) "addressing how, why, or what agency action was unlawfully delayed or withheld." JA___ [Op. 16]. It appears that Plaintiffs seek to resurrect Count II on appeal. Opening Br. 1, 35. But Plaintiffs ignore the district court's abandonment holding and have thus

forfeited any challenge to that holding by failing to raise it in the Opening Brief.

*Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("A party forfeits an

argument by failing to raise it in his opening brief.").

Plaintiffs also make different delay arguments for the first time on appeal.

Opening Br. 35-36 (modifying the Washburn Decision seven years later "violat[ed]

the traditional 6-year statutes of limitation period" in "28 U.S.C. § 2408 [sic]"); *id*.

at 48-51 (modifying the Washburn Decision seven years later was unfair to

Plaintiffs for several reasons). These new arguments should be rejected for failure

to raise them in the district court. *Flynn*, 269 F.3d at 1068–69. In any event, none

of the new arguments has merit.

First, Plaintiffs point out that "[p]arties challenging [a] final agency decision

are restricted to a 6-year statute of limitations." Opening Br. 50 (apparently

referring to 28 U.S.C. § 2401(a)). They appear to acknowledge that the six-year

statute of limitations does not apply to an agency's modification of an earlier

decision but argue that "it follows under the same principle of fairness, and needs

to balance competing interests, [that] it is fundamental to resolve legal disputes in a

reasonable timeframe." *Id*. But even if six years might be an appropriate measure

of unreasonable delay for purposes of 5 U.S.C. § 706(1) in some circumstances,

the relevant time period here is not the six and a half years between the

December 30, 2015 Washburn Decision and the May 31, 2022 Newland Decision,

49

but the three years between May 30, 2019 (when the BIA Regional Director invalidated the Secretarial Election adopting the 2018 Constitution based on the determination of the Office of Federal Acknowledgment that John Jeff was not the son of Jeff Davis), s*ee supra* p. 17, and the Newland Decision.

After the election was invalidated, disputes continued about tribal leadership. *See*, *e.g.*, JA___ [ECF 34-68] (July 13, 2021 Order of the Interior Board of Indian Appeals dismissing Silvia Burley's appeal relating to a contract proposal she submitted). Disputes also continued about participation in the Tribe's organization. Descendants of John Jeff argued that the John Jeff family was clearly part of the Miwok community of Calaveras County. *See*, *e.g.*, JA___ [ECF 34-74] (Mar. 9, 2022 letter from J. Humphrey citing its listing on censuses in 1880, 1900, 1905, 1906, 1910, and 1920). But the 1915 Census descendants argued that they alone should organize the Tribe under the Washburn Decision. *See*, *e.g.*, JA___ [ECF 34-76] (Apr. 4, 2022 letter from counsel for the 1915 Census descendants).

On March 28, 2022, AS-IA Newland decided to pause the BIA Pacific Region's efforts to assist the Tribe with its organization so that he could consider the "additional historical and genealogical facts related to the Tribe [that] have come to light" since the Washburn Decision. JA___ [ECF 34-75]. Two months later, Newland issued his decision revising the eligibility criteria in the Washburn

Decision.  Plaintiffs have not argued that the three years between BIA's

invalidation of the April 2019 Secretarial Election, which resulted from their

efforts, and Newland's response to the genealogical error undermining the

Washburn Decision, constituted "unreasonabl[e] delay[]" under the APA, 5 U.S.C.

§ 706(1).

Second, Plaintiffs reference Interior's regulations governing administrative

appeals of BIA decisions, 25 C.F.R. Part 2, which provide that parties adversely

affected by BIA decisions must file appeals within specified time periods.  *Id*. at

49, 51 & n.16.  These regulations have no bearing on whether Newland timely

modified the Washburn Decision.  And Plaintiffs' general assertion that

"[m]odifications [of final agency actions] … are often time-limited and require

adherence to specific procedural rules," *id*. at 51, without reference to any specific

applicable provisions, similarly provides no support for Plaintiffs' time-related

arguments.

Third, Plaintiffs unpersuasively argue that AS-IA Newland "lacked the

ability to ascertain with certainty the facts and circumstances surrounding the 2015

Washburn Decision" because he "was seven years removed from AS-IA

Washburn's decision-making."  Opening Br. 50.  Newland's review of Washburn's

eligibility criteria was based on the written record—the Washburn Decision and its

administrative record—not the memory of live witnesses.  Plaintiffs do not assert

51

that relevant documents were lost and thus fail to demonstrate that the Newland Decision was materially affected by the passage of time.

And fourth, Plaintiffs' argument that Newland failed to consider "the reliance interest of the CVMT, that had long been participating in the organization process of the BIA," Opening Br. 2, and that Newland's "harm[] [to] the reliance interest of the Appellants CVMT … was compounded by the seven year delay," *id.* at 48, is similarly unpersuasive. The descendants of John Jeff—who greatly outnumber Plaintiffs—have also "long been participating in the organization process," *id.* at 2, and thus have a countervailing reliance interest. As explained above (pp. 14, 16), they had participated in the drafting of the 2013 Constitution and 2018 Constitution and had voted in the elections to adopt those constitutions. Upon discovering evidence that John Jeff was not the son of Jeff Davis, Plaintiffs sought to exploit the factual error underlying the Washburn Decision to their advantage. AS-IA Newland cannot be faulted for considering the longstanding understanding of the great majority of Calaveras County Miwoks that they were entitled to participate in drafting the CVMT tribal constitution, including the Tribe's membership criteria. And as explained above (pp. 41-42), Plaintiffs' claim to a special status among the surviving members of the historical Miwok community in Calaveras County is not supported by the record. It was appropriate for Newland to reconsider the Washburn Decision in light of the new genealogical

52

evidence and to include the 1929 Census descendants in the group of eligible voters.

**III.    Plaintiffs' argument that the doctrine of issue preclusion barred Newland from revising the Washburn Decision lacks merit.**

Plaintiffs argue for the first time on appeal that the doctrine of issue preclusion barred AS-IA Newland from revising the Washburn Decision. Opening Br. 51-56. This Court should decline to entertain that new argument. *Jones v. Air Line Pilots Association, Int'l*, 642 F.3d 1100, 1104 (D.C. Cir. 2011) ("legal theories not asserted in the district court ordinarily will not be heard on appeal") (internal quotation marks omitted). In any event, their issue-preclusion argument is incorrect.

Plaintiffs correctly explain that "[t]he doctrine of issue preclusion bars relitigation of issues of law or fact previously decided *by a court*." Opening Br. 52 (emphasis added). But here, the issues of law and fact were previously decided by an executive branch official (AS-IA Washburn), not a court. Plaintiffs are incorrect that "[t]his doctrine applies equally to judicial and administrative decisions," *id*., so as to bar Newland from reconsidering the Washburn Decision. As explained above (p. 26), agencies are generally assumed to possess authority to revisit their own prior decisions—particularly when the prior decision was based on an undisputed error. *See, e.g.*, *Ivy Sports Med.*, 767 F.3d at 86. The two decisions Plaintiffs cite in support of their argument are readily distinguishable.

Plaintiffs misplace reliance on *Deerfield v. F.C.C.*, 992 F.2d 420, 424-28 (2d Cir. 1993). Opening Br. 52. In that case, the Second Circuit held that an administrative agency, the F.C.C., had no power to decide a preemption question after it was resolved by a federal court with jurisdiction over the matter. *Id*. at 428. Here, AS-IA Newland did not purport to modify the Washburn Decision in the face of a judicial decision on the matter. The application of the doctrine of issue preclusion in *Deerfield* has no bearing on the question whether a federal agency may modify *an earlier agency decision* in light of new evidence.

Plaintiffs also misplace reliance on *Spawr Optical Research, Inc. v. Baldrige*, 649 F. Supp. 1366, 1369 (D.D.C. 1986). *See* Opening Br. 52. The question in that case was whether a Department of Commerce Administrative Law Judge could adopt the facts proven in a prior criminal conviction in a hearing for violation of the Export Administration Act if the standards for issue preclusion were satisfied. *Id*. The court held that issue preclusion applied in that context. In this case, in contrast, there was no prior federal court decision holding that Washburn's criteria conclusively determined eligibility to participate in the Tribe's organization notwithstanding the incorrect premise that most of the Calaveras County Miwoks descended from Jeff Davis.

Plaintiffs' assertion in Part III that the Newland Decision "improperly seeks to relitigate settled issues" decided in *CVMT III*, Opening Br. 53, merely reiterates their incorrect argument in Part I that the Newland Decision violates *CVMT III*.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

/s/ *Mary Gabrielle Sprague*
ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*

AMBER BLAHA
MARY GABRIELLE SPRAGUE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-2753
mary.gay.sprague@usdoj.gov

June 6, 2025
DJ # 90-2-4-16606

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 12,840 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *Mary Gabrielle Sprague*
MARY GABRIELLE SPRAGUE

Counsel for Appellees

ADDENDUM

**25 U.S.C. § 5123(a)**

**(a)Adoption; Effective Date**

Any Indian tribe shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, and any amendments thereto, which shall become effective when—

**(1)** ratified by a majority vote of the adult members of the tribe or tribes at a special election authorized and called by the Secretary under such rules and regulations as the Secretary may prescribe; and

**(2)** approved by the Secretary pursuant to subsection (d) of this section.